CLIFFORD T. WILDER, Appellee, v. FRANCIS P. CONLON, Appellant.

No. 47156.

(Reported in 30 N. W. 2d 764)

FEBRUARY 10, 1948.

Lee & Anderson, of Estherville, for appellant.

Leo E. Fitzgibbons, of Estherville, for appellee.

SMITH, J.—On October 22, 1942, Mrs. Anna J. Wilder, a widow, was married to defendant. She owned a home in Estherville, Iowa, a $1,733 bank account, and $1,000 of Class "E" War Bonds. Some time before she had a stroke. "Her left arm hung limp at her side and she limped with one foot." Plaintiff herein was her only child. He was nineteen years old and had for six or eight months lived in Minneapolis.

The day before her wedding to defendant Mrs. Wilder asked Mrs. Murphy, a "next door" neighbor, to go with her to town saying she wanted to make a deed to plaintiff. The matter had been discussed between the ladies before. Defendant drove the two ladies down town. Mrs. Wilder went to attorney Francis J. Kennedy's office alone and signed and acknowledged the warranty deed in question here which she had the lawyer prepare, purporting to convey her home to plaintiff but reserving a life estate to herself. An hour or so later Mrs. Wilder told Mrs. Murphy what she had done and handed her the deed saying: "Here it is. You take this and keep it for me, if you will, until I send for it or I come and get it."

Mr. Kennedy testifies Mrs. Wilder told him she was going to be married the next day and that he told her, "to save any question about the deed becoming effective she should deliver it today; before she got married, anyway."

Mrs. Murphy testifies plaintiff came to her house the next morning ("I should judge about seven-thirty or eight o'clock") and said: "Mother sent me over after a paper that is here." She handed him the deed.

Plaintiff testifies he arrived in Estherville the evening of October 21, 1942, "around eight o'clock" on a bus from Minneapolis. He says his mother told him of the deed and sent him to get it and that he went over to Mrs. Murphy's the next morning and got it, shortly before defendant came to take them to the church.

Defendant, on the other hand, testifies he himself was with Mrs. Wilder the entire evening before the wedding, that they went to the church about nine o'clock to get their instructions and thereafter went to her home and "talked things over" until "a quarter to twelve" and that plaintiff was not there. Defendant further says they were married the next morning at 7:15 and contends plaintiff arrived in Estherville on the bus that got in at three or four o'clock the morning of the wedding.

I. There is much more of the record to be stated but this brings us to the first question presented. Defendant contends the deed was not delivered to plaintiff before the marriage. The trial court held otherwise. We think the holding

is sustained by the clear weight of the evidence. The advice of the attorney as to the necessity of delivery prior to marriage was explicit. Mrs. Wilder's purpose of conveying to her son had been discussed with Mrs. Murphy. It was definite and apparently fixed.

The deed itself is persuasive evidence. Kneeland v. Cowperthwaite, 138 Iowa 193, 115 N. W. 1026. Mrs. Wilder knew the whole transaction would be useless without delivery prior to the wedding. She must have communicated to plaintiff the fact that the deed had been signed and deposited with Mrs. Murphy, else he could not have known of it. Plaintiff's testimony is uncontradicted and corroborated by that of Mrs. Murphy and Mr. Kennedy. No question of its competency is raised. The decision on this point must be affirmed.

II. Concerning subsequent events there is rather more dispute. It should be first stated that some weeks prior to the wedding plaintiff visited his mother. He was getting recommendations to enable him to join the Air Corps. He knew of her contemplated marriage and admits he advised against it. The bonds heretofore mentioned, though paid for by Mrs. Wilder, were made payable to both her and plaintiff and were kept in her safe-deposit box to which plaintiff had access. He had placed them there. There were other papers in the box including the abstract to the house.

On the occasion of this earlier visit he removed the bonds without his mother's knowledge, took them with him back to Minneapolis and put them in a safe-deposit box there. Apparently Mrs. Wilder had not discovered their absence at the time of her marriage.

As preface to what follows it should be said defendant testifies in effect that he married Mrs. Wilder upon her solicitation and her promise to place the home in joint tenancy with him. Upon his suggestion that she had a son to think of she replied she would give her son the bonds, money in bank and insurance. The record shows the bank balance was reduced to $1.28 at her death and there is no other mention of insurance.

He says sometime after the wedding (the exact time not fixed) he and his wife went to the office of Mr. Kennedy, the attorney. The purpose of this visit was to have a deed drawn

to place the premises in their names as joint tenants. Here defendant says he first learned Mrs. Wilder (now Mrs. Conlon) had made the deed to her son. Defendant testifies he then asked if the joint deed could not be made anyway and placed of record "and the first deed on record would hold." Mr. Kennedy said: "No, that deed is made and it has got to be defended. The only way that can be done is to get the deed back and destroy it." Attorney Kennedy, as a witness for defendant, denies on cross-examination that Conlon and wife ever consulted him together.

Defendant further testifies his wife then said she had it in her box "down at Mr. Rainey's." They left the attorney's office and went to open the box and discovered everything was gone.

"Q. Did she say anything in there about the deed and the bonds? A. Yes, she said he took them unlawfully and he had no right to take them and she wanted them back."

They then went to see if the deed had been placed on record. He says she talked of sending the sheriff after her son but he (defendant) dissuaded her, saying he would be blamed, and induced her to write to her son instead—"Then we will see what he does, and if he don't send them back, then it is time enough to send the sheriff." He further says the letter was written the next day and undertakes to quote some of it.

From another source we get quite a different version. Mrs. Murphy testifies that a week or ten days after the wedding Mrs. Conlon came to her house, nervous and crying and seemed very blue; that she said she had just mailed a letter to her son to return the deed, that Pat (defendant) had found out about its execution. "He was just raising hell about it," and was threatening to have the FBI after him (plaintiff) and "he would show that boy a thing or two."

Mrs. Murphy also testifies to a conversation with defendant himself in which he said "he had sent Clifford [plaintiff] telegrams telling him to get those papers back or he would get the FBI after him." She (Mrs. Murphy) understood this just referred to the deed. She says that later Mrs. Conlon told her Clifford sent the deed back torn in pieces.

Plaintiff testifies he received a letter from his mother asking him to return the *bonds* but said nothing about the *deed*. In reply he returned the bonds. He says he also tore the deed and sent the pieces back with the bonds. He says that in the letter his mother told him, "Pat had found out about my taking the War Bonds" and "was raising holy hell more or less abusing her" and he (plaintiff) tore the deed "because I was so disgusted at her that Pat had been abusing her shortly after the wedding and her poor health." He adds: "I was willing to do anything to protect her. I thought perhaps if he saw the deed he might treat her kindly." On cross-examination he said the letter mentioned "that Pat had discovered of my having the deed and the bonds and that he had been * * * abusing her." Before returning the deed plaintiff tore out his mother's signature and burned it. He says this was the latter part of October or the fore part of November 1942.

Plaintiff also testifies the deed with the pieces taped together came back to him in an envelope with his mother's name on it ("it must have been by return mail") and he has had it since "in one form or another." He explains this last expression as meaning he kept it until on a visit home in May 1943, he put it back in his mother's box where it remained until she died in February 1945, when he removed it and left it at the residence of his fianceé in Minneapolis. He caused it to be recorded July 26, 1946.

Defendant testifies that on November 9, 1942, after plaintiff returned the papers he and his wife drove uptown and while she sat in the car he took the pieces of the deed up to the lawyer's office to have it identified as the deed Mrs. Wilder had made to her son. The girl in the office taped the pieces together and said it was the same deed.

Defendant and his wife then went to Mr. Rainey's office and had the deed drawn running to himself and wife as joint tenants with right of survivorship. It was recorded November 14, 1942. He said the patched-up deed to plaintiff thereafter "laid around on the buffet and table there for a long time and it was kicked around * * * so long, and I don't know, I think Mrs. she just threw it in this metal box sometime."

There is too much detail to be set out in full. Mrs. Conlon, on February 24, 1945, executed a straight-out warranty deed to defendant. She was seriously ill in the hospital and died two days later. Defendant says she sent him to have the deed drawn, that he went to Attorney Kennedy who refused to draw it and eventually it was drawn elsewhere. Mr. Kennedy testifies that this was the only visit to his office made by defendant and that in refusing to draw the deed he did not tell defendant of the deed to plaintiff "because I didn't know if he knew about it."

On this record it is contended for defendant that even if the deed to plaintiff was delivered the evidence shows a mutual intention on plaintiff's and his mother's part to destroy it and revest the title in her. Matheson v. Matheson, 139 Iowa 511, 514, 117 N. W. 755, 757, 18 L. R. A., N. S., 1167, and Blaney v. Hanks, 14 Iowa 400, are cited. The Matheson case announces the rule that "destruction of an unrecorded deed by the parties thereto with the intention by both to abandon the conveyance and restore the title to the grantor creates such an equitable right or interest in the latter that the grantee will be considered as holding the title in trust only for the benefit of the grantor."

The Blaney v. Hanks case applied the rule as against the purchaser at an execution sale under a judgment against the vendee, holding that as the cancellation of the transaction between vendor and vendee was in good faith with no intention to defraud creditors and the purchase money had been returned by vendor to vendee the latter held title "as a naked trustee without an interest" for the benefit of the vendor. The opinion makes clear that canceling of the deed merely destroys the *evidence* of title "but the title itself remains undestroyed."

In Brown v. Brown, 142 Iowa 125, 133, 120 N. W. 724, it is held that voluntary surrender (by the grantee) of the unrecorded deed and acceptance by the grantor as relinquishment of the title conveyed by it *in consideration of other agreements founded thereon* will estop grantee from asserting any further right under the instrument.

The rule of the Iowa cases is sustained by the cases cited in notes to 18 L. R. A., N. S., 1167, and 34 L. R. A., N. S.,

495. See, also, 26 C. J. S., Deeds, section 175; 16 Am. Jur., Deeds, section 354, notes 3 and 4.

We have here to determine upon disputed facts the question of intention of the parties to the deed. Having found there was original delivery to plaintiff it would seem the burden is on defendant to show such conduct of the parties as to establish the rights he claims. The conflicts in testimony cannot all be resolved. They consist principally of contradictions between the parties themselves.

It is undisputed that plaintiff did mutilate and return the deed to his mother. What she wrote him thereafter is disputed as is also the question of what was done with the deed after it was repaired. The mother's intention is not clear and even plaintiff's may be said to be in question.

Even if the deed was not returned to plaintiff as he testifies there is some significance in the fact it was not destroyed. Defendant's testimony that this important document was "kicked around the house" for a time and eventually put in the metal box is not convincing.

On the other hand, assuming plaintiff's version to be correct, the conduct of his mother in promptly returning the deed to him, presumably without defendant's knowledge, was peculiar. We have no certain way to penetrate the veil that conceals the real motives and intention of this harassed mother and wife.

Defendant's testimony that attorney Kennedy had told them by inference that the title could be recaptured by getting the deed back and destroying it is expressly denied by the attorney. And notwithstanding defendant's testimony that he was putting no pressure on his wife so he might acquire the property, there is the testimony of Mrs. Murphy that would either contradict it or convict Mrs. Wilder-Conlon of unbelievable mendacity.

Of course, defendant's testimony as to an antenuptial agreement was inadmissible under the statute of frauds. Section 622.32, Code, 1946. And his version of the proposal that resulted in their marriage is subject to a natural skepticism on the part of the disinterested reader.

Without attempting further analysis we are constrained

to hold the record does not justify a decision that the title revested in Mrs. Conlon or that plaintiff, after returning the deed, held title in trust for his mother.

III. Defendant further contends that, by reason of plaintiff's conduct since his mother's death in addition to the matters referred to in the preceding division hereof, plaintiff is estopped to assert ownership against defendant.

This claim of estoppel is based on the fact that defendant made material improvements to the property, consisting of a garage, sewer connections, bathroom installation, automatic-gas water heater, a substantial addition to the house and a new house on the land. He says he put up the garage soon after the marriage in 1942; the improvements in the home in 1943, and the new house in 1946.

The present suit was brought in August 1946. It is difficult under the evidence to determine the actual cost of these improvements. Defendant estimates it at $6,000. The trial court, while quieting title in plaintiff, allowed defendant $4,000 from which a mortgage of $1,250 placed thereon by defendant is to be paid or deducted.

Defendant claims he made the improvements without knowledge that plaintiff claimed title to the premises. There seems to be some basis for this claim though the testimony is in some dispute. Plaintiff says he delayed assertion of his claim until he was discharged from service, upon advice of the military counsel and of Attorney Kennedy.

We hold the trial court correctly solved this problem on the authority of Rainsbarger v. Rainsbarger, 208 Iowa 764, 224 N. W. 45, by making plaintiff's title subject to a lien for the amount due him after payment of the mortgage. The amount fixed by the court is not inadequate under the record.

IV. One other assignment or proposition is urged by defendant. He complains of the trial court's decision overruling his motion for new trial based upon alleged newly discovered evidence. All the tendered new testimony bears upon the question of timely delivery of the deed to plaintiff. Had it been produced on the trial it could not have overcome the affirmative showing of such delivery.

Most of it was cumulative. Some related to the time of plaintiff's arrival in town for the wedding but the cross-examination of defendant shows he already knew at the time of trial whatever was to be known of bus schedules, by reason of an alleged investigation made by him three or four years earlier. "I went to the hotel to find out because I wanted to be sure about the time he got there for my own personal reasons."

The overruling of the motion for new trial was not error.

We have studied this entire record with care. The controlling questions are largely of fact and much depends upon the comparative apparent credibility of the testimony of the parties themselves. We do not hesitate in deciding in favor of plaintiff on this basis. No good purpose could be served by setting the testimony out at greater length.

The decision of the trial court is affirmed.—Affirmed.

MULRONEY, C. J., and OLIVER, BLISS, HALE, GARFIELD, MANTZ, and HAYS, JJ., concur.